**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SQUARE ONE ENTERTAINMENT, INC.,

     Plaintiff,                          Civil Action No.: 1:20-cv-05685

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

     Defendants.

**COMPLAINT**

Plaintiff, SQUARE ONE ENTERTAINMENT INC. ("SQUARE ONE") hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and hereby alleges as follows:

**JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial Internet stores operating under the Defendant domain names and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant

1

Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of SQUARE ONE's trademark and/or work. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of SQUARE ONE's federally registered trademark to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused SQUARE ONE's substantial injury in the State of Illinois.

3.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District.

## INTRODUCTION

4.     This action has been filed by SQUARE ONE to combat online counterfeiters who trade upon SQUARE ONE's reputation and goodwill by selling and/or offering for sale products in connection with SQUARE ONE's SLAP CHOP trademark and copyright, which are covered by U.S. Trademark Registration No. 3,613,738 and US Copyright Registration No. VA0001750004. The trademark registration is valid, subsisting, unrevoked, uncancelled, and incontestable pursuant to 15 U.S.C. § 1065. The registration for the trademark constitutes prima facie evidence of validity and of SQUARE ONE's exclusive right to use the trademark pursuant to 15 U.S.C. § 1057(b). A genuine and authentic copy of the U.S. federal trademark registration certificate for the SLAP CHOP trademark is attached as **Exhibit 1**. A genuine and authentic copy

2

of the U.S. federal copyright registration certificate for the SLAP CHOP packaging is attached as **Exhibit 2**.

5.      Square One's SLAP CHOP Products are used and recognized as a symbol of kitchen tools to quickly and easily chop up vegetables, nuts, and fruits. The SLAP CHOP Products are widely promoted both in the United States and throughout the world. Consumers, potential customers, and other members of the public and the tool and construction industries not only associate Plaintiff's products with exceptional materials, style and workmanship, but also recognize the Plaintiff's products sold in the United States originate exclusively with Plaintiff.

6.      In the past, SQUARE ONE was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken. The company has availed itself of takedown procedures to remove infringing products, but these efforts have proved to be an unavailing game of whack-a-mole against the mass counterfeiting that is occurring over the Internet. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed SQUARE ONE and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices substantially below an original:

//

//

ORIGINAL



https://www.slapchop.com

COUNTERFEIT



4

7.     The above example evidences a cooperative counterfeiting network using fake eCommerce store fronts designed to appear to be selling authorized products. To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 3**.

8.     The Defendant Aliases share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>
> . . .
>
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
>
> . . .
>
> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

6

9.     eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform.  It formed a special task force that worked in conjunction with Chinese authorities for a boots-on the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks, it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20               f ✈ in +


BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.


See Xinhua, *Fighting China's Counterfeits in the Online Era,*  China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm  (**Exhibit 4**).

10.    SQUARE ONE has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good-will as well as the quality of goods bearing the SLAP CHOP trademark and work. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.

> …

> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

> . . .

> Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

> . . .

> Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2**) at 4, 8, 11.

11.    Not only are the creators and brand holders harmed, the public is harmed as well:

> The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.

> The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

12.    SQUARE ONE's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Aliases that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine SLAP CHOP's products, while selling inferior imitations. The Defendant Aliases also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. SQUARE ONE is forced to file this action to combat Defendants' counterfeiting of SQUARE ONE's registered trademark, as well as to

protect unknowing consumers from purchasing unauthorized SLAP CHOP products over the Internet.

13.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District. In addition, each defendant has offered to sell and ship infringing products into this Judicial District.

## THE PLAINTIFF

14.     Square One Entertainment, Inc., is a domestic company having its principal place of business in at 1680 Michigan Avenue, #700, Miami Beach, Florida 33139.

15.     SQUARE ONE has been engaged in the business of manufacturing, distributing and retailing hand operated kitchen utensils for over 20 years. In December 2008, Mr. Offer Shlomi (also known as "Vince Offer, "The ShamWow Guy") appeared in a kitchen-gadget infomercial, advertising the Slap Chop Products. The Slap Chop food chopper is a hand-held chopping device with internal blades. As noted by AdWeek, and according to an AdWeek blog, the Slap Chop line of product gained huge commercial success. An excerpt from a televised Slap Chop commercial featuring Vince Offer is briefly on screen during the 2013 blockbuster Marvel superhero movie Iron Man 3. In April 2019, DJ Steve Porter posted a 10-year anniversary video of the original electro-themed "Slap Chop Rap" Auto Tune remix.

16.     SQUARE ONE or its predecessors have exclusively used the SLAP CHOP trademark, and kitchen tools sold under the SLAP CHOP trademark are among the most popular ever sold, with sales in over 3.5 million units in the US and around the world.

17.     SQUARE ONE's brand, symbolized by the SLAP CHOP trademark, is a

recognized symbol of high-quality merchandise. The SLAP CHOP trademark is distinctive and identifies the merchandise as goods from SQUARE ONE. The registration for the SLAP CHOP trademark constitutes prima facie evidence of its validity and of SQUARE ONE's exclusive right to use the SLAP CHOP trademark pursuant to 15 U.S.C. § 1057 (b).

18.     The SLAP CHOP trademark has been continuously used and never abandoned.

19.     SQUARE ONE has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the SLAP CHOP trademark. As a result, products bearing the SLAP CHOP trademark are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from SQUARE ONE.

## THE DEFENDANTS

20.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and offered to sell and, on information and belief, sold and continues to sell counterfeit SLAP CHOP products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

21.     The success of the SLAP CHOP brand has resulted in its significant counterfeiting. Defendants conduct their illegal operations through fully interactive commercial websites and Online Marketplaces Accounts hosted on various e-commerce sites, such as eBay, Wish, Alibaba, Ali Express, eBay, DHGate, etc. ("Infringing Websites" or "Infringing Webstores"). Each Defendant targets consumers in the United States, including the State of

Illinois, and offered to sell and, on information and belief, sold and continues to sell counterfeit products that violate Plaintiffs' intellectual property rights ("counterfeit products") to consumers within the United States, including the State of Illinois.

22.     The Defendant Aliases intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter SQUARE ONE from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through their operation of the Infringing Webstores, Defendants are directly and personally contributing to, inducing and engaging in the sale of counterfeit products as alleged, often times as partners, co-conspirators and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell counterfeit products.

23.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of SQUARE ONE's ownership of the SLAP CHOP trademark, including its exclusive right to use and license such intellectual property and the goodwill associated therewith.

24.     Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Aliases. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

25.     The counterfeit SLAP CHOP products for sale in the Defendant Aliases bear similarities and indicia of being related to one another, suggesting that the counterfeit SLAP CHOP products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Aliases also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

26.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

27.     Further, counterfeiters such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operation in spite of SQUARE ONE's

enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

28.     Upon information and belief, Defendants also deceive unknowing consumers by using the SLAP CHOP trademark without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the Internet looking for websites relevant to consumer searches for SLAP CHOP products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Aliases listings show up at or near the top of relevant search results and misdirect consumers searching for genuine SLAP CHOP products. Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down. As such, Plaintiff also seeks to disable Defendant Domain Names owned by Defendants that are the means by which the Defendants could continue to sell counterfeit SLAP CHOP products.

29.     Defendants' use of the trademark on or in connection with the advertising, marketing, distribution, offering for sale and sale of the counterfeit products is likely to cause and caused confusion, mistake and deception by and among consumers and is irreparably harming SQUARE ONE. Defendants have manufactured, imported, distributed, offered for sale and sold counterfeit products using the SLAP CHOP trademark and continue to do so.

30.     Defendants, without authorization or license from SQUARE ONE, knowingly and willfully used and continue to use the SLAP CHOP trademark in connection with the

14

advertisement, offer for sale and sale of the counterfeit products, through, inter alia, the Internet. The counterfeit products are not genuine SLAP CHOP Products. SQUARE ONE did not manufacture, inspect or package the counterfeit products and did not approve the counterfeit products for sale or distribution. The Defendant Aliases offer shipping to the United States, including Illinois, and, on information and belief, each Defendant sold counterfeit products into the United States, including Illinois.

31.     Defendants also deceive unknowing consumers by using the SLAP CHOP trademark without authorization within the content, text, and/or meta tags of the listings on Infringing Webstores in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for SLAP CHOP products and in consumer product searches within the Webstores.

32.     Upon information and belief, Defendants will continue to register or acquire listings for the purpose of selling Counterfeit Goods that infringe upon the SLAP CHOP trademark unless preliminarily and permanently enjoined.

33.     Defendants' use of the SLAP CHOP trademark in connection with the advertising, distribution, offering for sale, and sale of counterfeit SLAP CHOP products, including the sale of counterfeit SLAP CHOP products into Illinois, is likely to cause and caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

34.     SQUARE ONE repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

35.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered SLAP CHOP Trademark

in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The SLAP CHOP trademark is highly distinctive. Consumers have come to expect the highest quality from SQUARE ONE's products provided under the SLAP CHOP trademark.

36.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the SLAP CHOP trademark without SQUARE ONE's permission.

37.     SQUARE ONE is the exclusive owner of the SLAP CHOP trademark. SQUARE ONE's United States Registration for the SLAP CHOP trademark (**Exhibit 1**) is in full force and effect. Upon information and belief, Defendants have knowledge of SQUARE ONE's rights in the SLAP CHOP trademark, and are willfully infringing and intentionally using counterfeits of the SLAP CHOP trademark. Defendants' willful, intentional and unauthorized use of the SLAP CHOP trademark is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

38.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

39.     SQUARE ONE has no adequate remedy at law, and if Defendants' actions are not enjoined, SQUARE ONE will continue to suffer irreparable harm to its reputation and the goodwill of its well-known SLAP CHOP trademark.

40.     The injuries and damages sustained by SQUARE ONE have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit SLAP CHOP products.

## COUNT II
### FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

41.      SQUARE ONE repeats and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

42.      Defendants' promotion, marketing, offering for sale, and sale of counterfeit SLAP CHOP products created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with SQUARE ONE or the origin, sponsorship, or approval of Defendants' counterfeit SLAP CHOP products by SQUARE ONE.

43.      By using the SLAP CHOP trademark in connection with the sale of counterfeit SLAP CHOP products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit SLAP CHOP products.

44.      Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit SLAP CHOP products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

45.      SQUARE ONE has no adequate remedy at law and, if Defendants' actions are not enjoined, SQUARE ONE will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

## COUNT III
### VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510, et seq.)

46.      SQUARE ONE repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

47.      Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit SLAP CHOP products as those of SQUARE ONE, causing

17

a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine SLAP CHOP products, representing that their products have SQUARE ONE's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

48. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

49. SQUARE ONE has no adequate remedy at law, and Defendants' conduct caused SQUARE ONE to suffer damage to its reputation and goodwill. Unless enjoined by the Court, SQUARE ONE will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

**COUNT IV**
**COPYRIGHT INFRINGEMENT 17 U.S.C. § 501(a)**

50. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

51. The SLAP CHOP Copyright has significant value and have been produced and created at considerable expense. Plaintiff is the owner the original work, which is covered by Copyright Registration. (**Exhibit 2**)

52. Plaintiff, at all relevant times, has been the holder of the pertinent exclusive rights infringed by Defendants, as alleged hereunder, including but not limited to the SLAP CHOP Copyright, including derivative works.

53. Upon information and belief, Defendants had access to the works through Plaintiff's normal business activities. After accessing Plaintiff's work, Defendants wrongfully created copies of the copyrighted SLAP CHOP Packaging without Plaintiff's consent and engaged

in acts of widespread infringement through posting the works via online websites and digital markets, and the creation and sale of prints.

54.     Plaintiff is informed and believes and thereon alleges that Defendants further infringed Plaintiff's copyright by making or causing to be made derivative works from the SLAP CHOP Copyright by producing and distributing reproductions without Plaintiff's permission.

55.     Defendants, without the permission or consent of the Plaintiff, have, and continue to sell online infringing derivative works of the copyrighted SLAP CHOP Work. Defendants have violated Plaintiff's exclusive rights of reproduction and distribution. Defendants actions constitute an infringement of Plaintiff's exclusive rights protected under the Copyright Act (17 U.S.C. §101 et seq.).

56.     Further, as a direct result of the acts of copyright infringement, Defendants have obtained direct and indirect profits they would not otherwise have realized but for their infringement of the copyrighted SLAP CHOP Work. Plaintiff is entitled to disgorgement of Defendants' profits directly and indirectly attributable to their infringement of the SLAP CHOP Work.

57.     The foregoing acts of infringement constitute a collective enterprise of shared, overlapping facts and have been willful, intentional, and in disregard of and with indifference to the rights of the Plaintiff.

58.     As a result of Defendants' infringement of Plaintiff's exclusive rights under copyrights, Plaintiff is entitled to relief pursuant to 17 U.S.C. §504.

59.     The conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C.

§§502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyright and ordering that Defendants destroy all unauthorized copies. Defendants' copies, plates, and other embodiment of SLAP CHOP Work from which copies can be reproduced should be impounded and forfeited to SQUAR ONE as instruments of infringement, and all infringing copies created by Defendants should be impounded and forfeited to SQUARE ONE, under 17 U.S.C §503.

## COUNT V
## CIVIL CONSPIRACY

60.     SQUARE ONE repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

61.     SQUARE ONE is informed and believes and thereon alleges that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, engaging in a collaborated efforts to the distribution, marketing, advertising, shipping, offering for sale, or sale of fake SLAP CHOP products are a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

62.     The intent, purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine SQUARE ONE and its business by unfairly competing against it as described above.

63.     The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

64.     As a direct and proximate cause of the unlawful acts and misconduct

undertaken by each Defendant in furtherance of the conspiracy, SQUARE ONE sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which SQUARE ONE has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, SQUARE ONE prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

   a. using the SLAP CHOP trademark and work or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine SLAP CHOP product or is not authorized by SQUARE ONE to be sold in connection with the SLAP CHOP trademark and work;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine SLAP CHOP product or any other product produced by SQUARE ONE that is not SQUARE ONE's or not produced under the authorization, control, or supervision of SQUARE ONE and approved by SQUARE ONE for sale under the SLAP CHOP trademark and associated with or derived from the SLAP CHOP work;

   c. committing any acts calculated to cause consumers to believe that Defendants' counterfeit SLAP CHOP products are those sold under the authorization, control, or supervision of SQUARE ONE, or are sponsored by, approved by, or otherwise connected with SQUARE ONE;

d. further infringing the SLAP CHOP trademark and work and damaging SQUARE ONE's goodwill;

e. otherwise competing unfairly with SQUARE ONE in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for SQUARE ONE, nor authorized by SQUARE ONE to be sold or offered for sale, and which bear any SQUARE ONE's trademark, including the SLAP CHOP trademark, or any reproductions, counterfeit copies, or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the online marketplace accounts, the Defendant domain names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit SLAP CHOP products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the SLAP CHOP Trademark and/or work or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine SLAP CHOP product or not authorized by Plaintiff to be sold in connection with the SLAP CHOP trademark and/or work.

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon SQUARE ONE a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

22

3) Entry of an Order that, at Plaintiff's choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Plaintiff, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiff's selection, and that the domain name registrars take any steps necessary to transfer the Defendant Domain Names to a registrar of Plaintiff's selection; or that the same domain name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

4) Entry of an Order that, upon SQUARE ONE's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as, but not limited to, Amazon, ContextLogic, eBay, DHGate, Alipay and Alibaba Group Holding Ltd. ("Alibaba") and any related entities (collectively, "Alipay"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant domain names, and domain name registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit SLAP CHOP products using the SLAP CHOP trademark and/or work, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit SLAP CHOP products using the SLAP CHOP trademark and/or work; and

    c. take all steps necessary to prevent links to the Defendant Online Stores and Domain Names identified on Schedule A from displaying in search results, including, but not limited to,

removing links to the Defendant Online Stores and Domain Names from any search index; and

5) That Defendants account for and pay to SQUARE ONE all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the SLAP CHOP trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

6) In the alternative, that SQUARE ONE be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the SLAP CHOP trademark;

7) For Judgment in favor of Plaintiff against Defendants for actual damages or statutory damages pursuant to 17 U.S.C. §504, at the election of Plaintiffs, in an amount to be determined at trial;

8) That SQUARE ONE be awarded its reasonable attorneys' fees and costs; and

9) Award any and all other relief that this Court deems just and proper.


DATED: September 24, 2020                    Respectfully submitted,

                                             /s/ Keith A. Vogt
                                             Keith A. Vogt (Bar No. 6207971)
                                             Keith Vogt, Ltd.
                                             111 West Jackson Boulevard, Suite 1700
                                             Chicago, Illinois 60604
                                             Telephone: 312-675-6079
                                             E-mail:  keith@vogtip.com

                                             **ATTORNEY FOR PLAINTIFF**